F I L E D
United States Court of Appeals
Tenth Circuit

AUG 25 2000

PATRICK FISHER
Clerk

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

TIMOTHY MELLON,

      Plaintiff-Appellee,

v.

CESSNA AIRCRAFT COMPANY,

      Defendant-Appellant.

Nos. 99-3292 and 00-3023

(D.C. No. 96-CV-1454-JTM)
(D. Kan.)

**ORDER AND JUDGMENT** [*]

Before **HENRY, BRISCOE**, Circuit Judges, and **ALLEY**, District Judge. [**]

Defendant Cessna Aircraft Corporation (Cessna) has filed two appeals which this court has consolidated on its own motion. In the first appeal, Cessna challenges the district court's grant of summary judgment in favor of plaintiff Timothy Mellon on Mellon's breach of contract/promissory estoppel claim arising out of Cessna's refusal to perform service on Mellon's aircraft. In the second

---

[*] This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

[**] The Honorable Wayne E. Alley, United States District Judge for the Western District of Oklahoma, sitting by designation.

appeal, Cessna challenges a post-judgment contempt order issued by the district court. We exercise jurisdiction pursuant to 28 U.S.C. § 1291. With respect to Cessna's first appeal, we reverse the district court's entry of summary judgment in favor of Mellon and remand with directions to enter summary judgment in favor of Cessna. With respect to Cessna's second appeal, we affirm in part and reverse in part the district court's post-judgment contempt order.

I.

Cessna is a Kansas corporation with its principal place of business in Wichita, Kansas. Cessna is the world's largest manufacturer of light and mid-size general purpose jet aircraft. In addition to its manufacturing operations, Cessna owns and operates a network of service centers throughout the United States that provide maintenance service to owners and operators of Cessna jets. Cessna has also licensed several independently-owned service centers in North America to perform maintenance service on Cessna jets. In addition to the Cessna-owned and Cessna-licensed service centers, there are approximately 70 fixed based operators in the United States that are certified by the Federal Aviation Administration (FAA) to service Cessna jets.

Mellon, a resident of Connecticut, currently owns a Citation I jet, serial number 501-0116, manufactured by Cessna. The jet was manufactured and delivered to its initial owner in 1979. Mellon purchased the jet in May 1989, and

2

became the tenth owner of record. Shortly thereafter, Mellon purchased and had installed on the jet an FAA-approved modification.[1] The modification added new fuel tanks to the jet to extend its flying range. According to Mellon, he contacted Cessna prior to purchasing the modification and was assured that installation of the modification would not prevent him from having his jet maintained and serviced at Cessna-owned service centers.

In early 1992, Mellon began investigating additional FAA-approved modifications that would extend his aircraft's flying range. In particular, Mellon focused on the Eagle 400 modification sold by Sierra Industries. The Eagle 400 modification, which essentially required an aircraft to be remanufactured, included the installation of new engines (different from the original engines certified and installed by Cessna), changes to the plane's wing structure, and changes to hundreds of other items. The modification resulted in different calibrations and specifications for the systems that measured airspeed, fuel quantity, and total gross weight. Prior to making a final decision, Mellon telephoned Charles Knapp, the acting general manager of a Cessna-owned service

---

[1] When an aircraft is approved by the FAA, a type certificate is issued under Part 23 of the FAA's regulations. Modifications to a particular aircraft, whether designed by the manufacturer or a third party, must also be FAA-approved. When the FAA approves a modification, it issues what is referred to as a supplemental-type certificate (STC). Modifications are apparently often referred to simply as "STCs."

3

center in Newburgh, New York, where Mellon regularly took his jet for service and maintenance. Mellon's purpose in contacting Knapp was to determine if installation of the Eagle 400 modification would affect his ability to have his jet serviced at Cessna-owned service centers. Mellon alleges he discussed with Knapp in general terms the extent of the Eagle modifications he contemplated making. Mellon further alleges he informed Knapp that the modification included the installation of new engines. Mellon believes he also may have told Knapp the modification included changing the jet's battery, and he may have shown Knapp a brochure regarding the proposed modification. Finally, Mellon alleges he informed Knapp that he was interested in continuing to have as much service work performed at Cessna-owned service centers as possible.

Although Knapp acknowledges that Mellon contacted him, his recollection of the conversation is slightly different. Knapp alleges Mellon informed him that the proposed modification included only the installation of new engines.[2] Further, Knapp denies that he made any promises regarding service to Mellon's jet at Cessna-owned service centers. It is uncontroverted that Knapp stated he would need to consult with Cessna management and get back in touch with Mellon. It is unclear from the record whether Knapp contacted Cessna management officials in

---

[2] According to Knapp, he was under the impression that Mellon's jet had already received an Eagle modification to its wings, and Mellon was simply contemplating upgrading the engines as well.

4

Wichita regarding Mellon's inquiry, or whether he simply contacted Cessna personnel in other Cessna-owned service centers.

Knapp subsequently telephoned Mellon and informed him that Cessna would continue to provide service for his aircraft if he purchased the proposed modification. According to Mellon, Knapp informed him Cessna would continue to perform routine maintenance, as well as phase inspections, on the aircraft.[3] The only exception, Mellon alleges, was for "parts that were added" during the modification. App. at 244. Mellon admits he was informed by Knapp he would have to seek service for such parts from Sierra. Knapp denies that he specified the type of service work Cessna would perform on Mellon's jet after the modification, or which Cessna-owned service centers (aside from the Newburgh service center) would provide service. Knapp further denies making any promises to Mellon regarding the length of time the Newburgh service center would continue to provide service on Mellon's jet.

After the second conversation with Knapp, Mellon purchased the Eagle 400 modification for a price of approximately $1.2 million. Between the completion of the modification in early 1993 and September 1995, the Cessna-owned service center at Newburgh, New York, continued to provide service for Mellon's jet.

---

[3] An aircraft apparently is required by the FAA to undergo a phase inspection on a routine basis in order to determine whether it is airworthy.

This service included the performance of a phase inspection. Mellon also received service from non-Cessna-owned service centers, including Sierra, during this same period of time.

On September 22, 1995, Cessna issued Service Letter SL500-03-01 (the Service Letter) to all owners of Citation jets equipped with modifications similar to Mellon's. The Service Letter stated that "STCs . . . developed without Cessna involvement and engineering approval w[ould] not be supported by Cessna." App. at 318. The Service Letter further stated that "Citation aircraft that have installed STCs that permit performance and/or alter limitations outside the Cessna FAA Approved Flight Manual may be refused service at Cessna service centers," and that "Cessna-owned service centers w[ould] not provide support in the way of installation, spare parts, repair, inspection or warranty for STCs not approved by Cessna." Id.

Cessna's issuance of the Service Letter was apparently prompted by problems encountered in providing service to Mellon's aircraft and another similarly-modified aircraft. Cessna-owned service centers were unable to obtain information from Sierra that would have allowed them to perform corrective action on defects found in areas affected by the Eagle 400 modification. Cessna officials ultimately decided that, due to the complexity of the modification and Cessna's lack of knowledge, it would be unable to service those areas on an aircraft that had

6

been modified by the Eagle 400, or to provide phase inspections for aircraft with the Eagle 400 modification. According to Cessna, if it performed service on Mellon's aircraft that FAA inspectors determined was beyond the authority of its repair station certificates, Cessna could be subjected to enforcement actions by the FAA that included both civil and criminal penalties.

As a result of the Service Letter, Mellon must seek service, including phase inspections, from Cessna-authorized service centers (who are independently-owned and thus not bound by the Service Letter) or other third-party servicers. It is undisputed that Sierra provides service, including phase inspections, for aircraft with the Eagle 400 modification. The cost of this service is less than the cost of service at a Cessna-owned service center.

## II.

Mellon filed this diversity action against Cessna in the United States District Court for the District of Columbia on June 10, 1996. The complaint alleged violations of Sections I and II of the Sherman Act (tying and monopolization) and breach of contract. Pursuant to a motion filed by Cessna, the case was subsequently transferred to the United States District Court for the District of Kansas. The parties filed cross-motions for summary judgment with respect to the breach of contract claim. On December 2, 1998, the district court denied Cessna's motion for summary judgment and granted Mellon's cross-motion for summary

judgment on the breach of contract claim. In pertinent part, the district court concluded that the uncontroverted facts demonstrated Mellon was entitled to prevail under a theory of promissory estoppel:

> Mellon spent $1.2 million on a modification to his airplane in reliance on Cessna's promise of continued service. Cessna upheld its promise for over two years. In light of Cessna's prior history in servicing Mellon's modified aircraft, it would be unconscionable for Cessna to suddenly refuse service to Mellon, especially since Mellon would not have purchased the expensive modification had Cessna not promised continued service.

App. at 82. The district court further concluded that Mellon was entitled to specific performance of the oral agreement with Cessna:

> The injury he has sustained is the lack of security he feels from obtaining major repairs and phase inspections from Cessna, an injury that cannot be addressed through the payment of money damages. This should not impose an unreasonable burden upon Cessna in light of its prior compliance with its agreement to provide maintenance and phase inspections on Mellon's modified aircraft. Any hardship Cessna may suffer in performing its agreement is not disproportionate to the value of the service Mellon seeks.

Id. at 83-84. As part of its order, the district court also granted Mellon's motion to dismiss his Sherman Act claims without prejudice. Cessna subsequently filed a motion to alter or amend the judgment, which the district court denied. In doing so, the district court also rejected Cessna's request for "clarification of its obligations under the contract":

> The court is not willing to rewrite the contract under the guise of ordering specific performance. The parties themselves know the scope of the contract, i.e., Cessna shall continue to service Mellon's

8

airplane in the same manner it did before it issued the service letter. In other words, whatever service and maintenance Cessna was providing at the time it issued the letter, that is what it is obligated to do.

The court does note that this contract is personal to Mellon. Upon Mellon's sale, transfer or assignment of the aircraft to any other person or entity, the contract terminates.

Id. at 95-96.

Cessna appealed the district court's order and filed a motion to stay the district court's order of specific performance pending appeal. This court denied that motion on November 29, 1999. On November 30, 1999, Mellon filed an emergency motion for contempt with the district court. In this motion, Mellon alleged that despite the district court's order, Cessna had continued to refuse to service his aircraft. Mellon further alleged his aircraft needed a Phase 4 inspection by the end of November 1999, and a Phase 5 inspection by the end of December 1999. When Cessna refused to service his aircraft, Mellon flew his aircraft to Texas to obtain the needed service from Sierra. After conducting a telephone hearing, the district court found that Cessna had acted in contempt of the prior orders. Accordingly, the district court ordered Cessna

to pay plaintiff's expenses in taking the aircraft to Texas, and for its phase inspections in Texas by Sierra. Second, following the completion of the Texas inspections, plaintiff [will be] permitted to present the aircraft for a second series of Phase IV and V inspections by Cessna. Cessna [is] ordered to complete these inspections as soon as it is reasonably possible. Third, Cessna [is] ordered to pay any reasonable attorney fees of plaintiff in bringing the . . . motion.

9

Supp. App. at 34.

## III.

*Case No. 99-3292 (Summary judgment rulings)*

We review the district court's grant of summary judgment de novo, applying the same legal standard used by the district court. Simms v. Oklahoma ex rel. Dep't of Mental Health & Substance Abuse Servs., 165 F.3d 1321, 1326 (10th Cir.), cert. denied, 120 S. Ct. 53 (1999). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In applying this standard, we examine the factual record and draw reasonable inferences therefrom in the light most favorable to the non-moving party. Penry v. Federal Home Loan Bank, 155 F.3d 1257, 1261 (10th Cir. 1998), cert. denied, 526 U.S. 1039 (1999).

Cessna contends the district court erred in granting summary judgment in favor of Mellon on his breach of contract claim.[4] In support of this contention,

---

[4] The parties agree, and we concur, that New York substantive law governs this dispute. See Boyd Rosene and Assocs. v. Kansas Mun. Gas Agency, 174 F.3d 1115, 1118 (10th Cir. 1999) (holding that federal court sitting in diversity "looks to the substantive law of the forum state, including its choice of law principles, to determine the applicable substantive law"); American States Ins. Co. v. McCann, 845 P.2d 74, 77 (Kan. App. 1993) (holding that, in Kansas, the

(continued...)

10

Cessna argues the alleged contract violates New York's Statute of Frauds and, in any event, is too vague to be enforced.[5]  Alternatively, Cessna argues that genuine issues of material fact exist regarding (1) the nature and extent of Knapp's promise to Mellon (e.g., the extent and nature of service to be provided to Mellon, the duration of the promise), (2) whether Mellon's alleged reliance on Knapp's promise was reasonable and foreseeable to Cessna, and (3) the nature of Mellon's alleged injuries.

New York's Statute of Frauds, codified in General Obligations Law 5-701(a)(1), "requires an agreement to be in writing if it cannot be performed within one year from the date of its making."  Kestenbaum v. Suroff, 704 N.Y.S.2d 260, 261 (N.Y. App. Div. 2000).  If an oral agreement "may be 'fairly and reasonably interpreted such that it may be performed within a year, the Statute of Frauds will not act as a bar however unexpected, unlikely, or even improbable that such performance will occur during that time frame.'"  Radnay v. Charge & Ride, Inc., 697 N.Y.S.2d 664, 665 (N.Y. App. Div. 1999) (quoting Cron v. Hargro Fabrics, 694 N.E.2d 56, 58 (N.Y. 1998)).  The determination of whether an agreement

---

[4](...continued)
applicable law in cases involving contract construction depends on where the contract was made).

[5]  Although not asserted by Cessna and therefore not addressed here, it is not apparent from the record presented what, if any, consideration Cessna received for its alleged agreement to continue servicing Mellon's aircraft.

11

satisfies the Statute of Frauds is a legal question under state law, see Joseph E. Seagram & Sons, Inc. v. Shaffer, 310 F.2d 668, 675 (10th Cir. 1962), and is thus subject to de novo review. See Salve Regina College v. Russell, 499 U.S. 225, 231 (1991) (holding that district court rulings on state-law issues are reviewed de novo).

Cessna contends that Knapp's alleged promise to provide continuing service to Mellon violates the Statute of Frauds because it cannot possibly be performed within one year. Mellon argues the promise could have been performed within one year if his aircraft had been "taken out of service," or if the aircraft had been destroyed by "fire, storm, or other natural disaster." Appellee's Brief at 23. Mellon also argues that even if the promise could not have been performed within one year, application of the Statute of Frauds should be estopped because it would be unconscionable to not enforce the relied-upon promise.

Assuming, arguendo, that Knapp made a promise of continuing service on behalf of Cessna, we conclude that promise could not possibly have been performed within one year. The alleged promise did not impose upon Cessna an obligation to perform a single task that might or might not have been performed with one year, but instead required Cessna to maintain Mellon's aircraft for an indefinite period of time. See, e.g., George Burke Co. v. Intermetro Indus. Corp., 702 N.Y.S.2d 37, 38 (N.Y. App. Div. 2000) (concluding that alleged oral

12

agreement for plaintiff to become and indefinitely remain defendant's exclusive distributor of certain product could not be performed within one year and was thus void under Statute of Frauds). Mellon suggests performance of the promise could have been completed within one year if his aircraft had been destroyed or otherwise taken out of service. We are not convinced, however, that this is sufficient under New York law to avoid the Statute of Frauds. In applying the Statute of Frauds, the New York courts have long distinguished "between 'performance' which fulfils [a] contract, and circumstances which defeat its purpose." Cohen v. Bartgis Bros. Co., 35 N.Y.S.2d 206, 208 (N.Y. App. Div. 1942). Here, the destruction of Mellon's aircraft within one year of Knapp's alleged promise would have defeated the purpose of the promise, but would not have fulfilled it. Thus, the hypothetical circumstances suggested by Mellon are insufficient to defeat Cessna's Statute of Frauds defense.

Even Mellon's ability to sell his aircraft at any time and thereby terminate the alleged agreement with Cessna is insufficient to satisfy the Statute of Frauds. Under New York law, "a contract with a termination provision can be performed within one year [and thereby satisfy the statute of frauds] if there is a possibility, however slight, that the termination can be unilaterally effected within one year." William J. Conlon & Sons, Inc. v. Wanamaker, 583 F. Supp. 212, 216 (E.D.N.Y. 1984). There are two important limitations to this rule, however. First, "the

13

termination provision must be express" rather than implied.  Id.  The fact that an agreement contains an implied termination provision "is insufficient to remove [it] from the requirements of the Statute of Frauds."  Id.  Second, the termination provision must afford the party to be charged with the contract (i.e., the defendant) the right to terminate.  See, e.g., Special Event Entertainment v. Rockefeller Center, Inc., 458 F. Supp. 72, 76 (S.D.N.Y. 1978) ("Were plaintiff to have a right, based only upon an oral representation, to unilaterally extend the contract for more than one year, the defendant would be at the mercy of such representation without any protection from possible fraud."); North Shore Bottling Co. v. C. Schmidt and Sons, Inc., 239 N.E.2d 189, 191 n.3 (N.Y. 1968) (noting Statute of Frauds bars oral agreements affording only the plaintiff an option to terminate); Belfert v. Peoples Planning Corp. of America, 199 N.Y.S.2d 839, 842 (N.Y. Sup. Ct. 1959) (noting where the right to terminate is limited unilaterally to the plaintiff, "it is illusory, from the point of view of the defendant, to consider the contract terminable or performable within one year"); Supplee v. Hallanan, 179 N.Y.S.2d 725, 726-27 (N.Y. Sup. Ct. 1958) (rejecting argument that oral contract providing plaintiff a unilateral option to cancel within a year satisfied the Statute of Frauds).

The alleged agreement at issue in this case fails to meet either of these requirements. The district court concluded the alleged agreement was "personal to Mellon," and "[u]pon Mellon's sale, transfer or assignment of the aircraft to any

14

other person or entity, the contract terminates." Addendum to Appt.'s Opening Brief at 19. In other words, the district court concluded the alleged agreement between Mellon and Cessna contained an implied provision affording Mellon the unilateral right to terminate the agreement by selling, transferring, or assigning his aircraft to another person or entity (the right to terminate was clearly not express, in that there is no evidence it was ever discussed by Mellon and Knapp). Obviously, the agreement afforded Cessna no such right. Instead, it was allegedly bound to service Mellon's aircraft for as long as Mellon owned it. Thus, even assuming Mellon had an implied right to terminate the agreement and could have done so within one year, that is not sufficient under New York law to satisfy the Statute of Frauds.

We now turn to Mellon's estoppel argument. New York law permits parties in limited circumstances to rely on the doctrine of promissory estoppel as a means of overcoming a Statute of Frauds defense to a breach of contract claim. See Cyberchron Corp. v. Calldata Sys. Dev., Inc., 47 F.3d 39, 44 (2d Cir. 1995) (outlining New York cases on the issue). A court may, at its discretion, "disregard a mandate of the Statute of Frauds" if the plaintiff has suffered an "extraordinary and unconscionable injury . . . beyond that which flows naturally from the non-performance of the unenforceable agreement." M.K.D. Capital Corp. v. Miller, 652 N.Y.S. 2d 919, 921-22 (N.Y. Sup. Ct. 1996). However, as the Second Circuit

has noted, the limitations on the availability of this theory of promissory estoppel must be enforced because "[t]he strongly held public policy reflected in New York's Statute of Frauds would be severely undermined if a party could be estopped from asserting it every time a court found that some unfairness would otherwise result." Philo Smith & Co. v. USLIFE Corp., 554 F.2d 34, 36 (2d Cir. 1977). The district court in this case rejected Cessna's Statute of Frauds argument on the grounds that Mellon had suffered unconscionable injury in reliance on Knapp's promise of continued service, and that uncontested evidence otherwise supported Mellon's promissory estoppel claim. Because Cessna's Statute of Frauds defense ultimately hinges upon these conclusions, we proceed to review them in detail.

To reiterate, a plaintiff seeking to avoid New York's Statute of Frauds and recover under a theory of promissory estoppel must demonstrate an unconscionable injury arising out of his reliance on the defendant's promise. Readco, Inc. v. Marine Midland Bank, 81 F.3d 295, 301 (2d Cir. 1996). Although the New York courts have not specifically defined the phrase "unconscionable injury," they have indicated it encompasses only injuries "beyond that which flow[] naturally . . . from the non-performance of the unenforceable agreement." Merex A.G. v. Fairchild Weston Sys., Inc., 29 F.3d 821, 826 (2d Cir. 1994); see also Philo Smith, 554 F.2d at 36 (suggesting unconscionable injury normally involves an

16

"irremediable change in position" on the part of the party seeking to avoid the Statute of Frauds).

The district court concluded Mellon established this element by uncontroverted evidence:

> Mellon has suffered injury as a result of his reliance on Cessna's promise to continue servicing his aircraft after he installed the Eagle 400 modification. Mellon can no longer obtain the service he so highly values at Cessna-owned service centers. The confidence he once had in the airworthiness and safety of his Citation no longer exists.

App. at 81. The district court also noted: "In light of Cessna's prior history in servicing Mellon's modified aircraft, it would be unconscionable for Cessna to suddenly refuse service to Mellon, especially since Mellon would not have purchased the expensive modification had Cessna not promised continued service." Id. at 82.

After carefully examining the record, we reject the district court's conclusions. Although Mellon alleges he purchased the Eagle 400 modification in reliance on Knapp's alleged promises, "[t]his hardly seems the sort of irremediable change in position normally associated with the doctrine of promissory estoppel." Philo Smith, 554 F.2d at 36. There is no dispute that Mellon has reaped, and continues to reap, benefits from the Eagle 400 modification in terms of the extended flying range it affords him. Although Mellon alleges his confidence in the airworthiness and safety of his aircraft has diminished as a result of Cessna's

17

refusal to service his aircraft, there is no evidence that the failure to enforce Knapp's alleged promises would effectively deprive Mellon of the use of his aircraft or substantially diminish his ability to dispose of it. Mellon's injury did not result in an "irremediable change in position." Id. Mellon's diminished confidence in the airworthiness of his aircraft could be remedied by replacement of his aircraft. At best, Mellon has established that the market value of his aircraft has been reduced by approximately $50,000 because he cannot have it serviced at Cessna-owned service centers.[6] In our view, none of this evidence is sufficient to establish an "unconscionable injury" under New York law.

Because Mellon has failed to present evidence sufficient to establish the existence of an unconscionable injury, we conclude the district court erred in granting summary judgment in favor of Mellon on his breach of contract/promissory estoppel claim.[7] For this same reason, we conclude the district court erred in denying Cessna's motion for summary judgment based upon its Statute of Frauds defense.

---

[6] On this point, we note that the aircraft did not receive exclusive service from Cessna prior to Mellon's ownership. Thus, it appears debatable whether Cessna's alleged breach of promise had any effect on the market value of the aircraft.

[7] In light of our conclusions regarding the unconscionable injury element, we find it unnecessary to address the remaining elements of Mellon's promissory estoppel claim. Likewise, we find it unnecessary to address Cessna's challenge to the district court's award of specific performance in favor of Mellon.

18

*Case No. 00-3023 (Contempt order)*

Cessna challenges the district court's December 28, 1999, contempt order. Cessna asserts (1) its failure to conduct a Phase 5 inspection on Mellon's aircraft did not violate the district court's specific performance order; (2) even if Cessna did violate the district court's specific performance order, it did so as a result of the ambiguity of that order; and (3) "because the contempt sanctions are, in part, criminal, reversal is required because the district court ignored virtually all of Cessna's due process rights." Cessna's Opening Brief at 14.

A district court's resolution of a civil contempt motion is reviewed for abuse of discretion. See Reliance Ins. Co. v. Mast Constr. Co., 159 F.3d 1311, 1315 (10th Cir. 1998). "'Abuse of discretion is established if the district court's adjudication of the contempt proceedings is based upon an error of law or a clearly erroneous finding of fact.'" Id. (quoting Reliance Ins. Co. v. Mast Constr. Co., 84 F.3d 372, 375-76 (10th Cir. 1996)). To prevail in a civil contempt proceeding, the plaintiff must prove by clear and convincing evidence that (1) a valid court order existed, (2) the defendant had knowledge of the order, and (3) the defendant disobeyed the order. Id.

Cessna contends it did not disobey the district court's specific performance order because that order did not require it to conduct a Phase 5 inspection on Mellon's aircraft. According to Cessna, the district court's specific performance

19

order "established . . . a safe harbor for Cessna to limit its servicing of Mellon's airplane – it did not have to service Sierra's modifications (principally, the reconfigured wings and the new engines)." Cessna's Opening Brief at 14. Cessna argues that "[t]he contempt sanction, in contrast, requires Cessna to perform a Phase 5 inspection, which means servicing *all* of Mellon's airplane, *including* portions modified by Sierra." Id. (emphasis in original).

We agree that the district court's initial order granting summary judgment and awarding specific performance in favor of Mellon was less than clear. In the "Background" section of the order, the district court concluded that "Knapp told Mellon that Cessna would continue to service his aircraft once he installed the Eagle 400 modification, excluding, however, any maintenance on parts that were added in the modification. As to those parts, Knapp advised Mellon that he would have to return the airplane to Sierra for service." App. at 77. In the section of the order addressing the award of specific performance, the district court referred to Cessna's "agreement to provide maintenance and phase inspections on Mellon's modified aircraft." Id. at 84. Nowhere did the district court specifically outline Cessna's continuing responsibilities to Mellon.

The district court clarified the specific performance order when it denied Cessna's motion to alter or amend judgment. Cessna's motion to alter or amend judgment asked the district court to "identify explicitly the services and

inspections [Cessna was] not obligated to perform under the agreement." Id. at 91.

In response, the district court stated:

> The facts are quite simple. Mellon bargained specifically for Cessna service before he purchased the modifications to his Citation. Cessna indicated it would continue to service the modified aircraft, with the exception of the modifications themselves. Based on Cessna's promise to continue its service and maintenance, Mellon purchased the modifications and had them installed. Cessna did not state for how long it would continue to service and maintain Mellon's modified airplane. Therefore, Mellon reasonably believed Cessna would continue to service and maintain his airplane for as long as he owned it. Cessna upheld its promise to service and maintain Mellon's airplane until it issued the service letter in September 1995.
> * * *
> Cessna has requested a clarification of its obligations under the contract. The court is not willing to rewrite the contract under the guise of ordering specific performance. The parties themselves know the scope of the contract, i.e., Cessna shall continue to service Mellon's airplane in the same manner it did before it issued the service letter. In other words, whatever service and maintenance Cessna was providing at the time it issued the letter, that is what it is obligated to do.
> The court does note that this contract is personal to Mellon. Upon Mellon's sale, transfer or assignment of the aircraft to any other person or entity, the contract terminates.

Id. at 94-96.

We conclude that Cessna, in refusing to perform a Phase 5 inspection on Mellon's aircraft, violated the district court's orders. It is true, as pointed out by Cessna, that the district court's orders were inconsistent to some degree. On the one hand, the court's orders acknowledged Knapp did not promise that Cessna would service or maintain parts added to Mellon's airplane by the modification

21

process. On the other hand, the court's orders required Cessna to maintain the pre-Service Letter level of service; a level which effectively required Cessna to service parts added to Mellon's airplane during the modification process. Although the district court never specifically directed Cessna to perform a Phase 5 inspection on Mellon's airplane, the gist of the above-outlined orders was that Cessna was to continue providing the same level of service to Mellon that it had provided prior to the 1995 Service Letter. It was uncontroverted that, after Mellon purchased the Eagle 400 modification and before the 1995 Service Letter was issued, Cessna performed a Phase 5 inspection on Mellon's airplane. Thus, Cessna knew or reasonably should have known that the district court intended that Cessna conduct phase inspections on Mellon's airplane.[8] We therefore conclude the district court acted within its discretion in concluding that Cessna violated the specific performance decree.

Cessna contends the district court "crossed the line between civil and criminal contempt" when it "ordered Cessna to reimburse Mellon for Sierra's Phase 5 inspection without any opportunity for Cessna to purge its purported

---

[8] Cessna appears to be correct in asserting that the district court effectively extended the promise allegedly made by Knapp to Mellon. That is, instead of acknowledging the exception expressly outlined by Knapp, the district court's orders require Cessna to inspect parts added to Mellon's airplane by Sierra. Nevertheless, the proper course of action was for Cessna to comply with the district court's orders.

contempt." Cessna's Opening Brief at 24. Cessna further contends that "[b]y imposing criminal fines and charging Cessna with criminal contempt before evidence could be received or briefing completed, the district court violated Cessna's right to due process." Id.

"[A] contempt order . . . is characterized as either civil or criminal depending upon its primary purpose." Law v. National Collegiate Athletic Assoc., 134 F.3d 1025, 1030 (10th Cir.), cert. denied, 525 U.S. 822 (1998). "Essentially, contempt is considered civil if the sanction imposed is designed primarily to coerce the contemnor into complying with the court's demands and criminal if its purpose is to punish the contemnor, vindicate the court's authority, or deter future misconduct." United States v. Lippitt, 180 F.3d 873, 876 (7th Cir.), cert. denied, 120 S. Ct. 389 (1999); see United Mine Workers v. Bagwell, 512 U.S. 821, 827 (1994) (noting that civil contempt sanctions are "designed to compel future compliance with a court order," and "are considered to be coercive and avoidable through obedience"); Gompers v. Buck's Stove & Range Co., 221 U.S. 418, 441 (1911) (noting a sanction is civil if it is "remedial, and for the benefit of the complainant," and criminal if it is "is punitive, to vindicate the authority of the court"). "A contempt fine . . . is considered civil and remedial if it either 'coerce[s] the defendant into compliance with the court's order, [or] . . . compensate[s] the complainant for losses sustained." Bagwell, 512 U.S. at 829

23

(quoting United States v. United Mine Workers, 330 U.S. 258, 303-04 (1947)). "Where a fine is not compensatory, it is civil only if the contemnor is afforded an opportunity to purge." Id. at 829. "Thus, a 'flat, unconditional fine' totaling even as little as $50 announced after a finding of contempt is criminal if the contemnor has no subsequent opportunity to reduce or avoid the fine through compliance." Id. (quoting Penfield Co. v. SEC, 330 U.S. 585 , 590 (1947)).

Here, we conclude the monetary penalty imposed on Cessna (i.e., having to reimburse Mellon for the cost of the Phase 5 inspection performed by Sierra) was criminal, rather than civil. Although the penalty at first blush appears compensatory, it was imposed before Mellon had sustained any losses, aside from his travel expenses to Texas which were incurred prior to the hearing where the sanctions were imposed against Cessna. As previously indicated, Mellon filed his motion for contempt on November 30, 1999, approximately one day after this court denied Cessna's motion to stay judgment pending appeal. At that time, Mellon was seeking to have a Phase 5 inspection performed on his aircraft, but had not yet scheduled an inspection to be performed by either Sierra or Cessna. During the hearing on Mellon's motion, the district court permitted Cessna's counsel to speak with Cessna service representatives to determine if and when they could perform a Phase 5 inspection on Mellon's aircraft. The following day, December 1, 1999, Cessna's counsel informed the district court and Mellon's counsel that Cessna's

24

service center in Newburgh could perform a Phase 5 inspection on Mellon's aircraft on December 13, 1999. Rather than simply directing Cessna to conduct the Phase 5 inspection on that date at Mellon's expense, the district court allowed Mellon to choose what he wanted to do. Mellon instead chose to have a Phase 5 inspection performed at Sierra (at Cessna's expense) during the first week of December, and then to have a second Phase 5 inspection performed by Cessna at a subsequent date (at his own expense). The result of allowing Mellon to make this choice deprived Cessna of the opportunity to purge its contempt and forced Cessna to pay for the cost of the Phase 5 inspection to be performed by Sierra. In short, the penalty imposed on Cessna was neither compensatory nor coercive, but rather punitive.[9]

Because the district court did not afford Cessna the requisite procedural protections before imposing the monetary penalty, the sanction must be reversed. "'Criminal contempt is a crime in the ordinary sense, and criminal penalties may not be imposed on someone who has not been afforded the protections that the Constitution requires of such criminal proceedings.'" Law, 134 F.3d at 1030 (quoting Bagwell, 512 U.S. at 826-27). "The degree of procedural safeguards

---

[9] The district court also directed Cessna to reimburse Mellon for the costs incurred in flying his aircraft to Texas and for his attorney fees in filing the contempt motion. Because these sanctions were clearly compensatory, we will allow them to stand.

required for criminal contempt proceedings varies based on the seriousness of the penalty, but notice is a basic requirement for any criminal contempt proceeding." Id. (internal citation omitted). Here, the district court failed to give Cessna notice that either the November 30, 1999, or the December 1, 1999, telephonic hearings "would be of a criminal nature, as required by Fed. R. Crim. P. 42(b) which provides that '[a] criminal contempt . . . shall be prosecuted on notice . . . [which] shall state the essential facts constituting the criminal contempt charged and describe it as such.'" Id. "Because the procedures required of criminal contempt proceedings were not followed here," we reverse the contempt sanction. Id.

Finally, Cessna contends that if this court "reverses the contempt order and remands Mellon's motion to the district court for a hearing, it also should require appointment of a different district judge to conduct the hearing." Cessna's Opening Brief at 31. We need not address Cessna's contention at length because there will be no remand for further contempt proceedings. Instead, the criminal contempt sanctions are reversed. See Law, 134 F.3d at 1030-31 (reversing criminal sanctions imposed by district court without remanding case for further proceedings). This is consistent with the notion that "[a] criminal contempt proceeding is an independent criminal action." United States v. Peterson, 456 F.2d 1135, 1139 (10th Cir. 1972).

IV.

The court is in receipt of appellant's counsel's letter of supplemental authority dated May 16, 2000, and appellee's counsel's letter of May 17, 2000, in response. We remind both counsel that it is not the court's responsibility to obtain materials from the district court record. <u>See</u> 10th Cir. R. 10.3(B). Instead, it is counsel's responsibility to file the materials necessary for the court to properly review the issues raised on appeal. <u>See</u> 10th Cir. R. 10.3(C)-(E), 30.1(A)(1).

V.

With respect to Case No. 99-3292, we REVERSE the judgment of the district court and REMAND with directions to enter summary judgment in favor of Cessna on Mellon's breach of contract claim. With respect to Case No. 00-3023, we AFFIRM the district court's contempt order to the extent it requires Cessna to pay for Mellon's travel expenses to Texas and attorney fees for filing the contempt motion, but REVERSE the contempt sanctions requiring Cessna to pay for the Phase 5 inspection performed by Sierra.

Entered for the Court

Mary Beck Briscoe
Circuit Judge